ALLETE, INC., d/b/a Minnesota
Power, Appellant,

v.

GEC ENGINEERING, INC.,
et al., Respondents.

No. A06–881.

Court of Appeals of Minnesota.

Jan. 30, 2007.

John H. Bray, Kanuit & Bray, Ltd.,
Hermantown, MN, for appellant.

Mark L. Knutson, Dryer Storaasli Knut-
son & Pommerville, Ltd., Duluth, MN, for
respondents.

Considered and decided by MINGE,
Presiding Judge; SHUMAKER, Judge;
and HUDSON, Judge.

## OPINION

MINGE, Judge.

Appellant claimed a security interest in,
and sought to garnish, property originally
located in Missouri which had been ac-
quired by respondent, a Texas resident,
and moved to Texas. Appellant challenges
the district court's summary judgment de-
termination that it did not have a security
interest in the property. Respondent chal-
lenges the jurisdiction of Minnesota courts.
Because we conclude appellant did not
have a security interest in the property,
we affirm.

### FACTS

In December of 2000, appellant Minne-

sota Power, Inc.[1] negotiated an economic-development loan with respondent GEC Engineering, Inc. (GEC), a start-up company that was attempting to develop technology to convert diesel engines to run on cleaner-burning propane or natural gas. GEC and appellant are Minnesota corporations. To secure the loan, GEC executed a security agreement dated December 28, 2000. As collateral for the loan, the security agreement granted appellant a security interest in, "[a]ll equipment and inventory located at Borrower's facility at 510 W. 3rd Avenue North, Aurora, Minnesota." A financing statement listing equipment and inventory located at that Minnesota site was filed in this state.

Appellant's agreement to make a loan to GEC was based on its understanding that GEC, then operating in Missouri, was relocating to appellant's service area in Aurora, Minnesota. But by April 15, 2001, the target moving date, GEC had not relocated to Aurora and was experiencing financial difficulty. Appellant and GEC then filed a standard Minnesota UCC–1[2] financing statement in Missouri. The financing statement states:

> This financing statement covers the following types or items of property. . . .
> A. All equipment and inventory located at Borrower's facility located at 116 Holloway Road, Ballwin, MO[.]

The financing statement was recorded on May 3, 2001 and signed by respondent Jerry Brougher, the then-president of GEC. GEC never moved to Aurora, and early in 2002, the company ceased its operations and became insolvent. GEC failed to repay its loan with appellant, and appellant obtained a default judgment against GEC in Minnesota.

The subject of this dispute is a diesel engine that GEC purchased in Minnesota on April 15, 1999, to develop a prototype engine that would enable it to design and manufacture conversion kits for other engines. GEC bought the engine in South St. Paul and shipped the engine to CK Engineering (CK) in Ballwin, Missouri. GEC used CK's Missouri location for its operations. CK assisted in the testing and development of the engine. But GEC never paid CK for its services, and apparently abandoned the engine and other property at CK's site when it ceased operating. To recover some of the money owed to CK for its work on and storage of the engine, CK sought to sell the engine. In the summer of 2004, respondent Danielle Dellhomme[3] purchased the engine from CK Engineering for $18,000. Respondent was an investor in and former director of GEC. She is a Texas resident. CK shipped the engine to respondent in Texas, where it is currently stored. The engine was never located in Aurora, Minnesota. Although it

---

1. At the time of the loan transaction, appellant, *Allete, Inc.,* used the name Minnesota Power. In the interest of consistency, we use Minnesota Power and appellant in this opinion.

2. *Minnesota has adopted the Uniform Commercial Code (UCC). See* Minn.Stat. ch. 336 (2006). The UCC provides for a standardized financing statement, known as UCC–1, adopted by the National Conference of Commissioners on Uniform State Laws and set forth in the state regulations. *See* Minn.Stat. § 336.9–521(a) (2006); Minn. R. 8280.0040, subp. 2 (2005). Article 9 of the UCC was revised and, as revised, enacted effective July 1, 2001. *See* 2000 Minn. Laws ch. 399, Art. 1, § 130, at 672. The parties do not claim and it does not appear that this revision has any effect on the matters at issue in this appeal. For ease of reference, all citations and quotations are from the currently effective law.

3. Although this action started as a collection proceeding against GEC and its former president, they are not involved in the present garnishment action and appeal. "Respondent" in this opinion only refers to Dellhomme.

appears that respondent was aware of appellant's loan to GEC and that she had visited Minnesota as a part of GEC's business, the record does not indicate that she was personally involved with or personally liable for GEC's debt to appellant.

During its post-judgment collection process in Minnesota state courts, appellant learned respondent was in possession of the engine and the testing equipment attached to it, property it claims was collateral for its loan to GEC. Appellant served respondent with Minnesota garnishment pleadings and moved the Minnesota district court for an order requiring her to surrender and deliver the engine to appellant. Respondent claimed that the Minnesota court lacked subject matter and personal jurisdiction, that appellant did not have a security interest in the engine, that even if it once had a security interest, it was displaced by the possessory mechanics lien of CK, and that the rights she acquired from CK were superior to the claims of appellant. After discovery, the district court granted summary judgment in favor of respondent and found that appellant never held a security interest in the engine. This appeal followed.

## ISSUE

Does appellant have a valid security interest in the disputed engine?

## ANALYSIS

The threshold question is which state's law governs the determination of whether appellant has a valid security interest in the disputed engine. As a commercial transaction, this dispute is subject to the UCC. We note that Minnesota, Missouri, and Texas have all adopted the UCC. *See* Minn.Stat. ch. 336 (2006); Mo. Ann. Stat. ch. 400 (West 2006); Tex. Bus. & Com. Code Ann. §§ 1.101–9.709 (Vernon 2006). There is also no claim that either the UCC

or the caselaw in the various states differs with respect to the issue before us, and the parties do not dispute the proper choice of law. Under the circumstances, this is what is often called a "false conflict." *See Alside, Inc. v. Larson*, 300 Minn. 285, 293, 220 N.W.2d 274, 279 (1974); Restatement (Second) of Conflict of Laws § 186 cmt. c (1971); 16 Am.Jur.2d *Conflict of Laws* § 85 (1998). Accordingly, we apply Minnesota law.

The issue is whether appellant has a security interest in the disputed engine. When reviewing the district court's grant of summary judgment, we ask whether there are any genuine issues of material fact and whether the district court erred in applying the law. *State by Cooper v. French*, 460 N.W.2d 2, 4 (Minn.1990). When the district court grants summary judgment based on the application of a statute to undisputed facts, the result is a legal conclusion, reviewed de novo by the appellate court. *Lefto v. Hoggsbreath Enters., Inc.*, 581 N.W.2d 855, 856 (Minn. 1998).

Minn.Stat. § 336.9–203 (2006) governs the attachment and enforceability of security interests. Subdivision (a) of that section provides that "[a] security interest attaches to collateral when it becomes enforceable against the debtor...." Minn. Stat. § 336.9–203(a). A security interest in collateral "is enforceable against the debtor and third parties" if three conditions are met:

(1) value has been given;

(2) the debtor has rights in the collateral or the power to transfer rights in the collateral ... and

(3) one of the following conditions is met:

(A) the debtor has authenticated a security agreement that provides a description of the collateral

. . . .

Minn.Stat. § 336.9–203(b). Here, the parties do not dispute that value was given or that GEC had rights in the engine. The parties only dispute whether GEC "authenticated" a security agreement that provides a description of the collateral, sufficient to create a security interest in the engine.

The UCC defines "security agreement" as "an agreement that creates or provides for a security interest." Minn.Stat. § 336.9–102(a)(73) (2006). A more general UCC definition section states that an "agreement" is a "bargain of the parties in fact, as found in their language or inferred from other circumstances, including course of performance, course of dealing, or usage of trade. . . ." Minn.Stat. § 336.1–201(3) (2006).

■ We do not understand appellant to claim that the parties' original security agreement created a security interest in the engine. Nor could it. The plain language of the security agreement only grants appellant a security interest in equipment "located at Borrower's facility at 510 W. 3rd Avenue North, Aurora, Minnesota." It is undisputed that the engine was never located in Aurora. We consistently give a contract its "plain and ordinary meaning . . . even if the result is harsh." *Denelsbeck v. Wells Fargo & Co.,* 666 N.W.2d 339, 346–47 (Minn.2003) (quotation omitted).

Appellant seizes on the UCC's flexible definitions of "security agreement" and "agreement" to argue that the financing statement the parties filed in Missouri creates a material fact issue as to whether the parties amended the original security agreement to give appellant a security interest in the engine. Although the UCC does not explicitly address the question of whether a financing statement can bootstrap a lender into a secured status, there are several provisions that are relevant to the answer.

■ The drafters of the UCC contemplated a distinction between a security agreement and a financing statement, and defined the two terms differently. *See* Minn.Stat. § 336.9–102(a)(39), (73) (2006). It follows that the drafters understood the two documents to have different functions. Our caselaw confirms that the purpose of a financing statement is different from an agreement creating a security interest in collateral. "In contrast [to a security agreement], the financing statement serves the purpose of putting nonparties such as other subsequent creditors on notice that the debtor's property is encumbered." *Prod. Credit Ass'n of W. Cent. Minn. v. Bartos,* 430 N.W.2d 238, 241 (Minn.App.1988).

The language used in security agreements and financing statements reflects their functions. The security agreement must somehow state that a lien is created in identifiable collateral. Minn.Stat. § 336.9–102(a)(73). By contrast, the financing statement is a bare-bones document that simply gives names and addresses and a description of property. In fact, until recently, the Minnesota standard form financing statement had no language that mentioned the term "security interest" or even referred to the described property as "collateral." *Compare* Minn. R. 8260.0600, subp. 3 (1995), *with* Minn. R. 8280.0040, subp. 2 (2005) (setting forth earlier and current standard forms for UCC–1, the latter of which uses the word "collateral" in the heading above the space provided for a description of the property).

■ The question we face is whether a financing statement with limited language can amend the plain and unambiguous description of collateral in a security agreement. We recognize that courts have

found that a financing statement, in conjunction with other writings, constitutes a security agreement creating a security interest in property. *See In re Numeric Corp.*, 485 F.2d 1328, 1332 (1st Cir.1973) ("[A]n adequate [security] agreement can be found when a financing statement is considered together with other documents."). But we are aware of no court that has held that a standard financing statement, standing alone or with only parol evidence, is sufficient as a matter of law to create a security interest in collateral, or to amend an unambiguous security agreement. *See id.* at 1331 ("A considerable body of case law has developed to the effect that a standard form financing statement, taken alone, cannot also be considered a 'security agreement' that satisfies § 9–203(1)(b).").

Here, the security agreement contains an explicit description of property that is limited to equipment located at a specific address in Aurora, Minnesota and certain other assets. There is nothing in the original security agreement that even implies that the security interest extends to equipment not located at that site. Appellant is correct that the Missouri financing statement implies a willingness to grant a security interest in the engine which is located in Missouri. Further, there is evidence that GEC's business plan for moving to Minnesota had collapsed, that appellant had advanced funds, and that the engine in question was of interest to appellant as collateral. Appellant's argument has a certain appeal. But there is nothing from the debtor that grants appellant a security interest in the collateral located in Missouri. The financing statement used in this proceeding has no reference to the described property as collateral. Other than the financing statement, appellant offers only obscure references to the engine in various items of correspondence as evidence of such an amendment. These references are largely comments by appellant's employees. The comments from GEC are oblique at best and require considerable interpolation.

If we were simply dealing with the imponderables of what constitutes adequate evidence of negligence, summary judgment dismissal of appellant's claim would be premature. However, the case before us does not turn on the weight of the evidence. Instead, we must determine the level of formality needed to establish a prima facie case that the parties amended a written contract with an explicit definition of collateral. Appellant's claims compete with rights of not just a debtor, whose interests in property that is not collateral can be overridden by executing on a judgment, but of other interested parties. Thus, we require an objective standard. Absent an indication that there is admissible evidence that the claimed amendment meets the core requirements needed to establish a security interest in the claimed additional collateral, there is not an adequate showing that appellant's claim can survive summary judgment. These core requirements include *words granting a lien or security interest. See* Minn.Stat. § 336.9–203(b). Some written evidence or acceptable substitute is needed to establish that such a grant of a lien was made.

Here, because there is no admissible evidence in the record that GEC actually granted a security interest in the equipment in Missouri to appellant, we conclude that appellant has no security interest in the disputed engine as a matter of law and that the district court did not err in ordering summary judgment.

Because we conclude that appellant does not have a security interest, we do not reach the questions of whether Minnesota courts had jurisdiction over respondent or

whether the interest she acquired from CK Engineering was superior to appellants.

## DECISION

Because, on the undisputed facts of this case, appellant has no valid security interest in the disputed property as a matter of law, we affirm.

**Affirmed.**