*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-0073**

Mike Weinandt,
Appellant,

vs.

Burl Peckman, et al.,
Respondents,
Markit County Grain, LLC, judgment creditor,
Respondent,
The Harris Weinandt Living Trust,
Appellant.

**Filed July 14, 2014
Affirmed
Stauber, Judge**

Roseau County District Court
File No. 68CV1146

Dennis H. Ingold, Alan B. Fish, Alan B. Fish, P.A., Roseau, Minnesota (for appellants Mike Weinandt and Harris Weinandt Living Trust)

Michelle E. Moren, Law Offices of Patrick D. Moren, Roseau, Minnesota (for respondents Burl Peckman, et al.)

Caren L. Stanley, Vogel Law Firm, Fargo, North Dakota (for respondent Markit County Grain)

Considered and decided by Stauber, Presiding Judge; Worke, Judge; and Larkin, Judge.

UNPUBLISHED OPINION

**STAUBER**, Judge

In an appeal from summary judgment directing disbursement of settlement funds held by appellant-trust to respondent-creditor, appellant argues that the district court erred by granting summary judgment because appellant-trust held a perfected security interest in the settlement funds based upon a duly filed financing statement and that the assignment of the settlement proceeds to appellant-trust was not a fraudulent transfer. We affirm.

## FACTS

Appellant Mike Weinandt (Weinandt) is a farmer who, for several years, borrowed money to fund his farm business from appellant Harris Weinandt Living Trust (trust).[1] Weinandt's father, Harris Weinandt, is the sole trustee of the trust. In 2008, 2009, and 2010, Weinandt completed a standard form Uniform Commercial Code (UCC) financing statement by hand that named himself as the debtor and the trust as the secured party, and listed crops, machinery, and livestock as collateral. These financing statements were filed with the secretary of state. No security agreement supporting the UCC filing was ever memorialized in a separate writing.

In 2009, Weinandt entered into a three-year farm lease agreement with respondents Burl Peckman, Gary Peckman, and Dennis Peckman (the Peckmans). In October 2010, Weinandt filed a complaint against the Peckmans, alleging that they "interfered with the quiet use and enjoyment of the property and tortiously interfered with

---

[1] Weinandt and the trust will be referred to collectively as "appellants."

contractual agreements associated with, and necessary for [Weinandt's] quiet use." On November 29, 2012, the parties entered into a confidential settlement agreement. On December 3, 2012, Weinandt assigned the proceeds of the confidential settlement agreement over to the trust.

On December 6, 2012, Weinandt and the Peckmans were served a garnishment summons by respondent Markit County Grain, LLC (Markit). Markit holds a judgment against Weinandt, docketed on February 6, 2012, for $89,822.55. On January 2, 2013, the district court granted the Peckmans' request to deposit the disputed funds with the district court. On March 22, 2013, Markit filed a complaint in interpleader asking the district court to disburse the disputed funds to Markit. Markit's complaint alleged that their claim to the settlement funds should take priority and that Weinandt's assignment of the funds to the trust was a fraudulent transfer under the Minnesota Uniform Fraudulent Transfer Act (MUFTA). Weinandt and the trust filed a motion for summary judgment, as did Markit.

On November 22, 2013, the district court issued an order granting Markit's motion for summary judgment and disbursing the disputed funds to Markit. The district court found that there was no actual dispute that Weinandt did not sign or authenticate the UCC financing statement, and that no separate security agreement existed, and therefore Weinandt failed to perfect the trust's security interest in the settlement proceeds. The district court also concluded that Weinandt's assignment of the settlement proceeds to the trust was a fraudulent transfer because Weinandt made the transfer with actual intent to

3

defraud his creditors and also because the transfer was made to an insider, and Weinandt

was insolvent when the transfer was made. This appeal followed.

## DECISION

This court "review[s] a district court's summary judgment decision de novo. In

doing so, [this court] determine[s] whether the district court properly applied the law and

whether there are genuine issues of material fact that preclude summary judgment."

*Riverview Muir Doran, LLC v. JADT Dev. Grp., LLC*, 790 N.W.2d 167, 170 (Minn.

2010). This court "view[s] the evidence in the light most favorable to the party against

whom summary judgment was granted." *STAR Centers, Inc. v. Faegre & Benson, L.L.P.*,

644 N.W.2d 72, 76-77 (Minn. 2002). "When the district court grants a summary

judgment based on its application of statutory language to the undisputed facts of a

case, . . . its conclusion is one of law and our review is de novo." *Lefto v. Hoggsbreath*

*Enters., Inc.*, 581 N.W.2d 855, 856 (Minn. 1998).

## I. Security interest

Minnesota statutes define when a security interest is enforceable against the debtor

or against third parties.[2] *See* Minn. Stat. § 336.9-203 (2012). A security interest is only

enforceable if (1) value has been given; (2) the debtor has rights in the collateral; and

(3) "the debtor has authenticated a security agreement that provides a description of the

---

[2] Minnesota has adopted the UCC. *See* Minn. Stat. §§ 336.1-101 to .9-809 (2012).
"Uniform laws are interpreted to effect their general purpose to make uniform the laws of
those states which enact them." *NHF Hog Mktg., Inc. v. Pork-Martin, LLP*, 811 N.W.2d
116, 117 (Minn. App. 2012) (quotation omitted), *review denied* (Minn. Mar. 20, 2012).
Appellate courts "give great weight to other states' interpretations of a uniform law." *Id.*
(quotation omitted).

4

collateral."[3] Minn. Stat. § 336.9-203(b). "Security agreement" is defined as "an agreement that creates or provides for a security interest." Minn. Stat. § 336.9-102(a)(74).

Appellants argue that because Weinandt filed a financing statement in compliance with the UCC, the security agreement was evidenced by a writing that conforms to Minn. Stat. § 336.9-203(b)(3)(A). A "financing statement" is "a record or records composed of an initial financing statement and any filed record relating to the initial financing statement." Minn. Stat. § 336.9-102(a)(39) (2012). A financing statement "serves the purpose of putting nonparties such as other subsequent creditors on notice that the debtor's property is encumbered." *Allete, Inc. v. GEC Engineering, Inc.*, 726 N.W.2d 520, 523 (Minn. App. 2007) (quotation omitted). A financing statement is sufficient only if it (1) names the debtor; (2) names the secured party or its representative; and (3) indicates the collateral covered by the financing statement. Minn. Stat. § 336.9-502 (2012).

There is no dispute that the financing statement Weinandt filed in 2010 met the requirements of Minn. Stat. § 336.9-502. But the parties dispute whether the financing statement, without more, constitutes an authenticated security agreement under Minn. Stat. § 336.9-203(b). The UCC "must be liberally construed and applied to promote its underlying purposes," which are to "simplify, clarify, and modernize the law governing commercial transactions" and to "permit the continued expansion of commercial

---

[3] Minn. Stat. § 336.9-203(b)(3), provides for other acceptable evidence where a security agreement does not exist, but these alternatives are not at issue here.

practices through custom, usage, and agreement of the parties." Minn. Stat. § 336.1-103(a). "Although no precise words are required in the Code, the definitions given indicate that there must be some language in the [security] agreement actually conveying a security interest." *Shelton v. Erwin*, 472 F.2d 1118, 1120 (8th Cir. 1973).

There are few Minnesota cases on point, but in *Allete*, this court addressed whether a financing statement could modify the express terms of a security agreement. 726 N.W.2d at 523. This court stated that the UCC contemplates a distinction between a security agreement and a financing statement because the two terms are defined by separate statutory provisions. *Id.* The difference between the two documents is that "[t]he security agreement must somehow state that a lien is created in identifiable collateral." *Id.* But "the financing statement is a bare-bones document that simply gives names and addresses and a description of property." *Id.* This court recognized that courts in other jurisdictions have held "that a financing statement, in conjunction with other writings, constitutes a security agreement creating a security interest in property." *Id.* at 524 (citing *In re Numeric Corp.*, 485 F.2d 1328, 1332 (1st Cir. 1973)). But "no court . . . has held that a standard financing statement, standing alone or with only parol evidence, is sufficient as a matter of law to create a security interest in collateral." *Id.*; *see also Shelton*, 472 F.2d at 1120 ("Although a financing statement conceivably could create a security interest, they usually do not contain the necessary grant of an interest section 9-203(1)(b) requires.").

Other jurisdictions have addressed whether a financing statement can substitute for a security agreement under UCC 9-203. *See Gibson Cnty. Farm Bureau Co-op. Ass'n,*

*Inc. v. Greer*, 643 N.E.2d 313, 318-20 (Ind. 1994) (discussing majority and minority views on this issue). A majority of jurisdictions hold, consistent with this court's decision in *Allete*, that while no magic language is required to create a security agreement "there must be language in the instrument which leads to the logical conclusion that it was the intention of the parties that a security interest be created." *Id.* at 319 (quotation omitted). The *Allete* decision also cited favorably *In re Numeric Corp.*, which adopted the composite document rule. *Allete*, 726 N.W.2d at 523-24. That rule provides that "although a standard form financing statement by itself cannot be considered a security agreement, an adequate agreement can be found when a financing statement is considered together with other documents." *In re Numeric Corp.*, 485 F.2d at 1332; *see also Gibson Cnty.*, 643 N.E.2d at 319 (discussing the composite document rule).

Appellants argue that the financing statement itself satisfies the requirements of Minn. Stat. § 336.9-203 even though it lacks language granting a security interest because granting language is unnecessary. Appellants rely upon language by one of the drafters of the original UCC Article 9 which criticized an earlier decision holding that granting language was necessary. *See Gibson Cnty.*, 643 N.E.2d at 318 (quoting 1 Gilmore, *Security Interests in Personal Property* § 11.4, 342-48 (1965)). As the court in *Gibson Cnty.* recognized, Grant Gilmore stated that "[c]ertainly nothing in § 9-203 requires that the 'security agreement' contain a 'granting' clause. The § 9-[5]02 financing statement contained all that was necessary to satisfy the § 9-203 statute of frauds as well as being sufficient evidence of the parties' intention to create a security interest." *Id.* (quoting Gilmore, *supra*). But, at the time this criticism was written, the UCC required a

7

financing statement to contain more than merely the names of the parties and a description of the collateral. The UCC also required that a financing statement be signed by the debtor, who was also the party to be bound by any security agreement. Minn. Stat. Ann. § 336.9-502, U.C.C. cmt. 3, para. 3. The statute-of-frauds requirement contained within Minn. Stat. § 336.9-203 mandates that "the debtor must authenticate a security agreement that provides a description of the collateral." Minn. Stat. Ann. § 336.9-203, U.C.C. cmt. 3. Because "authenticate" also means "sign," a financing statement signed by the debtor that describes the collateral could logically satisfy the section 336.9-203 evidentiary requirement. *See* Minn. Stat. § 336.9-102(a)(7). But since the 1999 revisions to the UCC, which Minnesota subsequently adopted, a "financing statement cannot alone provide the necessary 'authentication.'" 4 James J. White & Robert S. Summers, *Uniform Commercial Code* § 31-3, at 120 (6th ed. 2010).

Appellants argue that the financing statement was authenticated by Weinandt when he completed the statement by hand and deposited it at the filing office. In order for the financing statement to qualify as a security agreement under Minn. Stat. § 336.9-203 it must have been "authenticated." "Authenticate" means "to sign" or "with present intent to adopt or accept a record, to attach to or logically associate with the record an electronic sound, symbol, or process." Minn. Stat. § 336.9-102(a)(7). UCC Article 1 defines "signed" as "using any symbol executed or adopted with present intention to adopt or accept a writing." Minn. Stat. § 336.1-201(b)(37) (2012). We conclude that merely hand-writing the financing statement and submitting it to the filing office is not sufficient to constitute a "symbol" of an intention to adopt a security agreement. *See*

8

White & Summers, *supra* § 31-3, at 120 (stating that a financing agreement which lacks the debtor's signature does not satisfy the statute of frauds requirement for an enforceable security agreement). Appellants further argue that it is a question of fact for a jury, and therefore there is a genuine issue of material fact precluding summary judgment. But we conclude that the threshold question of whether there exists a writing satisfying the statute of frauds requirement under UCC § 9-203 is a question of law. *See Gibson Cnty.*, 643 N.E.2d at 319-20 (stating that most courts hold that whether a financing statement may serve as a security agreement is treated as a question of law, and that even where it is treated as a mixed question of law and fact, the statute-of-frauds inquiry is treated as a question of law).

Appellants also argue that this court should look to extrinsic evidence of the parties' intentions and specifically to the parties' course of dealing as evidence that there was a security agreement. But parol evidence cannot be used to prove the existence of a writing that would satisfy the UCC § 9-203 statute of frauds requirement. *See* White & Summers, *supra* § 31-3, at 116; *see also In re Delta Molded Products, Inc.*, 416 F. Supp. 938, 942-43 (N.D. Ala. 1976) (declining to consider course of dealing evidence and stating that "[s]ection 9-203 being in the nature of a statute of frauds, parol evidence is not admissible to establish the statutory requirements"). Therefore, the financing statement, without more, is insufficient to create an enforceable security interest.

## II.    MUFTA

Appellants also argue that the district court erred by concluding that the assignment of the settlement proceeds to the trust was a fraudulent transfer under

9

MUFTA. Statutory interpretation is a question of law that this court reviews de novo. *Swenson v. Nickaboine*, 793 N.W.2d 738, 741 (Minn. 2011). MUFTA permits a creditor to attach proceeds of a fraudulent "transfer or obligation." Minn. Stat. § 513.47(a)(2) (2012). A transfer is voidable if made with either actual fraud or constructive fraud. *See* Minn. Stat. § 513.44-.47 (2012); *New Horizon Enterprises, Inc. v. Contemporary Closet Design, Inc.*, 570 N.W.2d 12, 15 (Minn. App. 1997). MUFTA defines two types of constructive fraud. Constructive fraud occurs where the debtor did not receive a reasonably equivalent value in exchange for the transfer or obligation and the transfer or obligation would essentially render the debtor insolvent. Minn. Stat. § 513.44(a)(2), .45(a). Or, constructive fraud occurs where the creditor's claim arose when (1) the debtor made the transfer "to an insider for an antecedent debt;" (2) the debtor was insolvent at the time of the transfer; and (3) the insider "had a reasonable cause to believe that the debtor was insolvent." Minn. Stat. § 513.45(b). But a transfer is not voidable if the transfer results from "enforcement of a security interest in compliance with article 9 of the [UCC]." Minn. Stat. § 513.48(e)(2) (2012).

Appellants argue that the assignment of the settlement proceeds to the trust was not fraudulent because it was made to enforce a perfected security interest under UCC article 9. But as previously explained, Weinandt failed to perfect the security interest in the proceeds derived from his crops. Therefore, the assignment of the settlement proceeds to the trust was not made to enforce a security interest.

Appellants also argue that they are entitled to a trial to determine whether the assignment of the settlement proceeds to the trust was made with actual intent to defraud

Markit. But actual fraud is only one type of fraudulent transfer under MUFTA. *See* Minn. Stat. § 513.44(a)(1) (defining as fraudulent transfers made with "actual intent to hinder, delay, or defraud any creditor of the debtor"). MUFTA also defines several types of constructive fraud under which actual intent is not required. *See* Minn. Stat. §§ 513.44(a)(2)(i), (ii), 513.45(a), (b). Markit argues that the transfer was constructively fraudulent under Minn. Stat. § 513.45(b) because the assignment was made to an insider. Markit points out that the sole trustee of the trust was Weinandt's father and that Weinandt was a beneficiary of the trust. *See* Minn. Stat. § 513.41(7)(i)(A) (2012); Unif. Fraudulent Transfer Act § 1, cmt. (7), &A U.L.A. 17 (2006) (stating that "a trust may be found to be an insider of a beneficiary"). Markit also argues that Weinandt was insolvent at the time the assignment was made. Under MUFTA, "a debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets." Minn. Stat. § 513.42(a) (2012). At the time the assignment was made, Weinandt had numerous judgments against him amounting to hundreds of thousands of dollars in debt. Weinandt also owed the trust significant sums of money for having purchased foreclosed farmland for Weinandt. Weinandt testified that he had about $300 in cash and that he had no other assets aside from money owed on a $500 judgment.

Normally, a creditor bears the burden of showing that a transfer is fraudulent. *Snyder Elec. Co. v. Fleming*, 305 N.W.2d 863, 867 (Minn. 1981). "[B]ut the relationship between the parties to a transaction may shift this burden to varying degrees." *Id.* Transactions involving insiders "are to be regarded with skepticism by the courts and closely scrutinized." *Id.* In order to overcome the presumption that a transaction is

11

fraudulent based on insider dealing, the debtor "must show by clear proof he acted with impartiality and fairness." *Id.* Here, appellants have not presented sufficient evidence to overcome the presumption that the assignment was constructively fraudulent under MUFTA. Therefore, Markit was entitled to summary judgment. *See DLH, Inc. v. Russ*, 566 N.W.2d 60, 71 (Minn. 1997) ("[W]hen the nonmoving party bears the burden of proof on an element essential to the nonmoving party's case, the nonmoving party must make a showing sufficient to establish that essential element.").

**Affirmed.**